## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ICE RAK, LLC**,

     Plaintiff,

v.                                                              Case No. 8:23-cv-2659-WFJ-TGW

**RITA'S FRANCHISE COMPANY, LLC**,

     Defendant.

_____/

## ORDER

Before the Court is Defendant Rita's Franchise Company, LLC's ("RFC") Motion to Stay Proceedings Pending Arbitration (Dkt. 8). Plaintiff Ice Rak, LLC ("Ice Rak") has responded in opposition (Dkt. 14), and RFC has replied (Dkt. 20). On February 2, 2023, the Court held an evidentiary hearing on this matter (Dkt. 34). Following the hearing, both parties filed supplemental briefings (Dkt. 37; Dkt. 39). Ultimately, upon careful consideration of the record, the Court grants the Motion.

## BACKGROUND

This declaratory judgment action focuses on the contractual relationship between Ice Rak and RFC. Among other things, Ice Rak contends that it is neither a franchisee, nor beholden to the duties and responsibilities of a franchise agreement executed between RFC and Ice Rak's managers. Dkt. 1 at 2–5. RFC conversely

maintains that Ice Rak must arbitrate this dispute even as a non-signatory to the same franchisee agreement. *See generally* Dkt. 8; Dkt. 39.

## I.     The Parties' Written Contracts

On July 31, 2020, RFC entered into a franchise agreement with Regina Tullio and Ramil Kaminsky (the "Agreement") for a Rita's frozen dessert shop in Lakeland, Florida (the "Shop"). *See* Dkt. 8-1; Dkt. 1 at 2. The Agreement provided for an alternative dispute resolution ("ADR") process followed by arbitration in the event that an issue arose between the parties. *Id.* at 65–67. While the Agreement did not establish a precise location for the Shop, it contained a timeline and requirements for doing so. Dkt. 8-1 at 15–19. One of these requirements was the execution of a lease rider designed to protect RFC's interests as a franchisor. *Id.*

Approximately four days after the Agreement was signed, Ice Rak filed its Articles of Organization, listing Ms. Tullio and Mr. Kaminsky as its managers. Dkt. 1-1 at 2; Dkt. 34 at 15. It was not until May 6, 2021, however, that Ice Rak entered into a lease agreement (the "Lease") for a property located at Market Square Shopping Center, 3115 U.S. Highway 98 N., Lakeland, Florida. Dkt. 1-2 at 1. The Lease was personally guaranteed by Ms. Tullio and Mr. Kaminsky. *Id.* at 31–32.

On the same day the Lease was executed, RFC, Ice Rak, and Ice Rak's landlord executed a lease rider (the "Lease Rider"). *Id.* at 34–36. The Lease Rider identified RFC as "Franchisor" and Ice Rak as "Franchisee[.]" *Id.* at 34. It also

2

provided that the leased premises could "only be used solely for the operation of a Rita's shop" and that "Franchisee assigns to Franchisor, with Landlord's consent, all of the Franchisee's rights, title and interest to and under the Lease upon any termination or expiration without removal of the [Agreement]." *Id.*

## II. The Parties' Business Relationship

In October 2021, following some recognition that Ms. Tullio and Mr. Kaminsky "apparently intended to use [Ice Rak] to operate their business[,]" RFC contacted Ms. Tullio about officially transferring the Agreement to Ice Rak. Dkt. 8 at 5; Dkt. 8-2 at 4. Ms. Tullio responded by indicating that she and Mr. Kaminsky were "very confused." Dkt. 8-2 at 4. They believed that, when "[they] signed [the] franchise agreement[,] [they] signed it with [Ice Rak]." *Id.* RFC explained that they had indeed signed the Agreement in their individual capacity but that "[t]his is not unusual. We prepare many entity transfers after the agreements are signed." *Id.* at 2–3. Despite her initial confusion, Ms. Tullio allegedly failed to respond to this information. Dkt. 8 at 5. The parties did not effectuate transfer at this time. *Id.*

There is no indication that Ice Rak had any issues with its franchisee status until it faced a standing challenge in a lawsuit filed against former customers in the County Court of the Tenth Judicial Circuit in and for Polk County, Florida (the "State

Lawsuit").[1] Therein, Ice Rak represented that it was "an independent franchisee" of RFC, that it sold Rita's products "under an undisputable legal right" at the Shop, and that it "marketed and advertised itself" on Facebook and Google as "Rita's Italian Ice and Frozen Custard." Dkt. 8-5 at 5. A number of defendants nevertheless raised standing as a threshold issue on the theory that Ice Rak had no legal interest in certain alleged harms to Rita's brand because it was technically not a franchisee. *See generally* Dkt. 8-6 at 2–11. When these defendants sought to obtain the Agreement to prove as much, Mr. Kaminsky, a lawyer, personally argued the following in court:

> But what happens in this particular instance, there was a franchise agreement, and then there could be transfers of rights or assignment of rights or vested rights. And one of those happened to be a lease agreement where the franchisee, Ice Rak, the franchisor, Rita's Corp, and the landlord, I can't remember their name, all signed one document, and that one document defines very clearly and identifies Ice Rak as the franchisee.

Dkt. 8-6 at 149. Ice Rak eventually filed motion to amend its complaint, which was still pending when RFC filed the instant Motion. Dkt. 8-7 at 2.

In March 2023, approximately two months after the court argument referenced above, the transfer issue came up again. Mr. Kaminsky contacted RFC requesting "help understanding if there [was] a potential breach of the [agreement] and individual exposure" due to certain contractual language and the Lease being

---

[1] *See Ice Rak, LLC v. Antone Moody, et al.*, Case No. 2021-cc-6402. In essence, this defamation-type suit alleged defendants (Ice Rak patrons) defamed the plaintiff Ice Rak by posting bad reviews online.

executed by Ice Rak while the Agreement was not. Dkt. 8-3 at 9. RFC advised Mr. Kaminsky that there was no issue because the Agreement "permits a transfer to an entity formed for the convenience of ownership." *Id.* at 7–8. Mr. Kaminsky then confirmed that "[Ice Rak] was formed for the convenience of ownership" and inquired whether anything "need[ed] to be paid regarding the 'transfer' to [Ice Rak]." *Id.* at 7. RFC explained what documents and fees would be required. Mr. Kaminsky went on to state that he was "trying to understand whether Ice [Rak] made misrepresentations" because "[Ice Rak] entered into many contracts, with RFC vendors, and signed the property lease addendum, even though the formal 'transfer' did not occur." *Id.* at 6. Mr. Kaminsky also expressed interest in a transfer form draft that might permit an "'effective date' pre-dating formal execution[.]" *Id.* at 6.

In response, RFC informed Mr. Kaminsky that, although there was no such draft, this "should not really have any impact with the vendors." *Id.* at 5. Mr. Kaminsky subsequently expressed his view that the situation was unique, as "it appear[ed] that mistakes were made by everyone before the store opened, because all believed, and acted as if there would be an entity franchisee with personal guarantees by the owners of the same." *Id.* Ultimately, RFC refused to "backdate any documents" and no transfer was effectuated. *Id.* at 4.

### III.   The Parties' Lawsuit

On October 20, 2023, RFC terminated the Agreement, Dkt. 8-9 at 2, and demanded liquidated damages thereunder, Dkt. 8 at 14. Ms. Tullio and Mr. Kaminsky allegedly refused to pay. RFC consequently submitted a demand for arbitration as provided for in the Agreement. Dkt. 8 at 14.

One month later, Ice Rak filed the instant declaratory judgment action. Dkt. 1 at 1. Ice Rak maintains that, "[c]ontrary to the representations of the Lease Rider, [Ice Rak] is neither a franchisee, nor beholden to the duties and responsibilities of a Franchise Agreement[.]" *Id.* at 5. Accordingly, Ice Rak requests a declaration effectively invalidating the Lease Rider and determining whether Ice Rak has any contractual obligations in relation to RFC. *Id.*

RFC now moves to compel arbitration under the Agreement. RFC further seeks to stay proceedings pending the outcome of such arbitration. *See generally* Dkt. 8.

### IV.   The Parties' Evidentiary Hearing

On February 2, 2024, the Court held an evidentiary hearing regarding the instant Motion. On direct examination from RFC's counsel, Ms. Tullio confirmed that (1) Ice Rak entered into the Lease "to operate a Rita's [shop] location from the space that was being leased," Dkt. 34 at 17; (2) Ice Rak was paying RFC vendors, RFC franchisee fees, and the Shop's payroll out of Ice Rak's own bank account, *id.*

at 28–29, 50; (3) Ice Rak had access and used RFC's internal "CoolNet" internet site, which provides RFC franchisees proprietary products for resale in Rita's shops, *id.* at 30–31; and (4) Ice Rak had "obtained insurance while it was running the [Shop]," which named RFC as an additional insured, *id.* at 51. Ms. Tullio also admitted that she believed Ice Rak and RFC had entered into a franchise agreement when she and Mr. Tullio signed the Agreement. *Id.* at 32. When asked whether Ice Rak ever operated under a written franchise agreement on cross-examination, however, Ms. Tullio answered "no." *Id.* at 60. She also indicated that no "franchise agreement [was] ever assigned or transferred to Ice Rak[.]" *Id.*

Following Ms. Tullio's cross-examination, the parties elicited testimony from RFC's General Counsel and Chief Compliance Officer, Gerald Wells. During direct, Mr. Wells generally testified about the numerous ways in which Ice Rak held itself out as an RFC franchisee, substantially complied with the Agreement, and directly benefited therefrom. *Id.* at 62–75. He then went on to claim that July 17, 2023, was the first time Mr. Kaminsky or Ms. Tullio ever tried to draw a distinction between themselves and Ice Rak for the purpose of franchisee status. *Id.* at 76–79.

On cross, Ice Rak's counsel primarily questioned Mr. Wells about RFC's own compliance in enforcing a number of provisions in the Agreement. Mr. Wells ultimately confirmed that no written transfer document was ever executed under Section 14.2 of the Agreement, *id.* at 85, and that neither Mr. Kaminsky nor Ms.

Tullio ever signed an "accepted location addendum" as provided for in Section 5.2 of the Agreement, *id.* at 89. Mr. Wells explained that RFC did not issue a notice of default in relation to these non-compliance issues because RFC essentially viewed strict compliance with the aforementioned provisions as redundancies or technicalities primarily aimed at protecting franchisees. *Id.* at 91–98.

The final witness called was Mr. Kaminsky. For the first time, Mr. Kaminsky explained that, in fact, Ice Rak was a franchisee of RFC, just not under the Agreement. *Id.* at 107.  Ice Rak had instead allegedly entered into an oral franchise contract with RFC on an unknown date after Mr. Kaminsky and Ms. Tullio signed the Agreement in their individual capacity but before Ice Rak signed the Lease. *Id.* at 107, 133. Mr. Kaminsky further clarified that this oral contract was the basis of the contractual relationship pled in the State Lawsuit. *Id.* at 106.

Following direct examination, RFC asked Mr. Kaminsky a number of questions about the alleged oral agreement Ice Rak reached with RFC through Mr. Kaminsky's conversations with Mr. Wells. Mr. Kaminsky could not offer many details:

> Q: All right. And Mr. Wells, in connection with granting this oral agreement, what representation did he make to you in terms of what the obligations of the franchisee would be under that oral agreement?
>
> A: He did not make any representations or obligations. We are both lawyers. We know what laws apply to franchise relationships.

> Q: Well, I mean, I'm a bit confused. How do you have an oral agreement with no obligations?
>
> A: When you use the term "franchisee" and "franchisor" as defined by Florida law or as discussed in Florida law with a distributor agreement, then the license rights to use a brand and the supply chain.

*Id.* at 133. Perhaps this is because the parties did not discuss many details in reaching the supposed oral agreement:

> Q: The oral agreement, there's no obligations associated with it. It's just created by the use of the term "franchise"; is that correct?
>
> A: The oral agreement? Yes, that one oral, yes.
>
> Q: And at that time, was the name Ice Rak exchanged between you and Mr. Wells concerning who this oral agreement would be with?
>
> A: I don't remember if we used the word "Ice Rak," but it was regarding the going back and forth of the lease agreement and lease rider. So it was implied in that conversations if it wasn't specifically mentioned.
>
> Q: So he was supposed to imply a party to an agreement?
>
> A: Gerald Wells who had multiple years of experience I hope would be able to imply such a thing. He's been practicing law way longer than I have. I am a nobody in this arena. So to the extent he didn't imply, I don't know, nor can I speculate what he did or didn't imply. I know that I would have no reason to speak to Gerald Wells but for the lease rider. So what he knew or didn't know, I don't know.

*Id.* at 135–36. Either way, Mr. Kaminsky eventually explained that Ice Rak's franchisee status was a product of "the continuing relationship between Ice Rak and [RFC]." Indeed, "[i]t started with the oral [agreement], codified into the [L]ease, and

9

then the continuing conduct of the parties continued that relationship. That is the position that Ice Rak maintains." *Id.* at 140.

## LEGAL STANDARD

"Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of arbitration agreements." *Emps. Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001). Under the Federal Arbitration Act ("FAA"), arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Further, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the language itself or an allegation of waiver, delay, or a likely defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Milestone v. Citrus Specialty Grp., Inc.*, No. 8:19-cv-2341-T-02JSS, 2019 WL 5887179, at *1 (M.D. Fla. Nov. 12, 2019) (stating that "[a] strong policy exists in favor of resolving disputes by arbitration").

The Court considers the following factors in determining whether to compel arbitration: "1) whether a valid written agreement to arbitrate exists; 2) whether an arbitrable issue exists; and 3) whether the right to arbitrate has been waived." *Williams v. Eddie Acardi Motor Co.*, No. 3:07-cv-782-J-32JRK, 2008 WL

686222, at *4 (M.D. Fla. Mar. 10, 2008) (citations omitted). "[T]he Court may consider matters outside the four corners of the complaint" in ruling on these issues. *KWEST Commc'ns, Inc. v. United Cellular Wireless Inc.*, No. 16-20242-CIV, 2016 WL 10859787, at *5 (S.D. Fla. Apr. 7, 2016), *report and recommendation adopted*, No. 16-20242-CIV, 2016 WL 10870449 (S.D. Fla. June 28, 2016). And, when deciding whether the parties have agreed to arbitrate certain matters, the Court generally applies state law principles governing the formation of contracts. *Am. Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## DISCUSSION

The Court will address the aforementioned arbitration factors in turn.

## I.     Whether a Valid Written Agreement to Arbitrate Exists

Neither party contests the general validity of the Agreement or the fact that it provides that "[a]ny dispute arising out of or in connection with this arbitration provision (including any question regarding its existence, validity, scope or termination) shall be referred to and finally resolved by arbitration." Dkt. 8-1 at 66. The issue, for RFC at least, is that Mr. Kaminsky and Ms. Tullio signed the Agreement in their individual capacity prior to incorporating Ice Rak. Ice Rak argues that this dispels any notion that it agreed to arbitrate the instant claims. RFC contends

that, even as a non-signatory, Ice Rak can be made to arbitrate under Section 26.9 of the Agreement and under principles of equitable estoppel.

The Court begins its analysis of these issues by considering choice of law. As the Eleventh Circuit has explained, "[s]tate law controls on the issue of whether an arbitration clause in a contract can be enforced against a non-signatory to that contract." *See Leidel v. Coinbase, Inc.*, 729 F. App'x 883, 886 (11th Cir. 2018) (citing *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011). And, "[w]hen deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Am. Exp. Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 940 (11th Cir. 1997) (cleaned up) (internal quotations and citation omitted). Here, the Agreement specifically provides that it "shall be interpreted and construed under the laws of the Commonwealth of Pennsylvania." Dkt. 8-1 at 65. Both parties nevertheless urge the Court to apply Florida law. Dkt. 37 at 5–6, 11; Dkt. 39 at 1–2. The Court will therefore do so.[2]

---

[2] While the Court has reservations concerning the applicability of Florida law, this particular choice of law issue appears to be an open question in the Eleventh Circuit. *See Leidel*, 729 F. App'x at 886 (declining to decide whether Florida law or California law applies to equitable estoppel in the context of arbitration where the subject arbitration agreement contained a choice of law provision favoring California law). Accordingly, because the parties agree that Florida law controls and the Court finds that the outcome of this case is the same under either state's laws, the Court will primarily rely on Florida law.

###### i.      Section 26.9 of the Agreement

The first issue to consider is whether Ice Rak can be bound to arbitrate under

Section 26.9 of the Agreement, which provides the following:

> The term "Franchisee" for purposes of this arbitration clause, shall
> include the shareholders, owners, Guarantor(s) (defined below),
> principals, members, or partners of Franchisee, or any person or entity
> claiming by or through any of the foregoing. Franchisee specifically
> agrees and acknowledges that claims arising out of or relating to this
> Agreement in any way against or by any person or entity, whether a
> signatory to this Agreement or not, shall be resolved through
> arbitration. Franchisee specifically agrees that this Section 26 is entered
> into without any fraud, duress, or undue influence on the part of
> Company or any agent, broker, or employee thereof.

Dkt. 8-1 at 68.

The Court finds that Section 26.9 operates to define Ice Rak as a franchisee

and therefore binds Ice Rak to arbitration concerning any claims that arise out of or

relate to the Agreement. In Florida, "it is well established that the courts broadly

construe arbitration provisions containing the language, 'arising out of or relating

to,' such that in certain instances the clause will include non-signatories."

*Cuningham Hamilton Quiter, P.A. v. B.L. of Miami, Inc.*, 776 So. 2d 940 (Fla. 3rd

DCA 2000) (collecting cases). Section 26.9 goes a step further by defining

franchisee to include "any person or entity claiming by or through" the Agreement's

guarantors. Dkt. 8-1 at 68. The Agreement's guarantors are Mr. Kaminsky and Ms.

Tullio. *Id.* at 72. Mr. Kaminsky and Ms. Tullio, moreover, are Ice Rak's only

members. It follows that Ice Rak has brought the instant action through these two

individuals and that Ice Rak is a franchisee for the purposes of the Agreement's arbitration provision. Any other reading would render Section 26.9 superfluous. *PNC Bank, N.A. v. Progressive Emp. Servs. II*, 55 So. 3d 655, 658 (Fla. 4th DCA 2011) (finding that an "interpretation which gives reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable"). Section 26.9 applies to Ice Rak. *Vic Potamkin Chevrolet, Inc. v. Bloom*, 386 So. 2d 286, 288 (Fla. 3rd DCA 1980) (finding the language "any controversy or claim arising out of, or relating to this agreement" broad enough to include non-signatories); *Armas v. Prudential Sec., Inc.*, 842 So. 2d 210, 211 (Fla. 3rd DCA 2003) (same); *Kratos Invs. LLC v. ABS Healthcare Servs., LLC*, 319 So. 3d 97, 102 (Fla. 3rd DCA 2021) (same).

### ii.    Equitable Estoppel

The second issue to consider is whether Ice Rak can be bound to arbitrate under principles of equitable estoppel. The Court finds that it can be under Florida or Pennsylvania state law regardless of Section 26.9's applicability.

Both Florida and Pennsylvania contract law provide that non-signatories may be estopped from disclaiming an agreement's arbitration provision where "the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001); *see*

14

*also Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005) (finding that "[e]quitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes"). This theory is based on the basic common law principle that "a non-signatory should not be permitted to embrace a contract for some purposes and then disclaim that same contract's unfavorable terms." *Amkor Tech., Inc. v. Alcatel Bus. Sys.*, 278 F. Supp. 2d 519, 521 (E.D. Pa. 2003); *see also Allied Pros. Ins. Co. v. Fitzpatrick*, 169 So. 3d 138, 142 (Fla. 4th DCA 2015) (finding that the non-signatory plaintiffs [could] not claim they [were] entitled to the benefit of the policy's coverage provision while simultaneously attempting to avoid the burden of the policy's arbitration provision). And, "[t]o prevail on this theory, the party seeking to enforce the arbitration clause must show that the non-signatory to be bound received a 'direct benefit' from the contract containing the clause." *Amkor Tech.*, 278 F. Supp. 2d at 521–22 (E.D. Pa. 2003) (quoting *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 350 (2d Cir. 1999)); *see also Seth v. Rajagopalan*, No. 12-CIV-61040, 2013 WL 11927712, at *8 (S.D. Fla. Jan. 25, 2013) (explaining that "[t]he theory of equitable estoppel provides that a non-signatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause").

Given this, Ice Rak may be equitably estopped from disclaiming the Agreement's arbitration clause for two reasons. To begin, there is no doubt that Ice Rak directly benefited from the Agreement. In the State Lawsuit, Ice Rak itself argued that it sold Rita's products, used Rita's marks, and advertised under Rita's brand. Dkt. 8-5 at 5. In email correspondences with RFC, Mr. Kaminsky made clear that Ice Rak had signed numerous agreements with Rita's vendors while representing itself as a Rita's franchisee. Dkt. 8-3 at 6. These are all direct benefits to Ice Rak which flowed from the franchisee status granted to Ice Rak's managers through the Agreement. *See* Dkt. 8-1 at 7 (granting franchisee right to use Rita's marks). Ice Rak cannot plausibly claim otherwise where the entire legitimacy of the Shop was grounded in the Agreement between RFC and Ice Rak's Managers.

In addition to directly benefiting from the Agreement, Ice Rak now assumes a position to RFC's disadvantage which is clearly inconsistent with the position Ice Rak took throughout the life of the Agreement. Indeed, throughout Ice Rak and RFC's entire relationship, Ice Rak held itself out as a franchisee to everyone it did business with. This began with the Lease Rider, which expressly identified Ice Rak as a franchisee to RFC and Ice Rak's landlord. Dkt. 1-2 at 34–36. It arose again in Ms. Kaminsky's direct correspondences with RFC. Dkt. 8-2 at 4. It continued in Ice Rak's State Lawsuit where Mr. Kaminsky personally argued that Ice Rak was a franchisee through assignment. Dkt. 8-6 at 149. And it culminated in Mr.

Kaminsky's correspondences with Ice Rak when he stated that "all believed, and acted as if there would be an entity franchisee with personal guarantees by the owners of the same" in an apparent attempt to get back-dated transfer documents. Dkt. 8-3 at 5. This is not to mention all of the representations Ice Rak made to Rita's vendors which Mr. Kaminsky himself acknowledged. *Id.* at 6. The Court has no doubt that Ice Rak's current position on its franchisee status is opposite to that it took for years preceding this declaratory judgment action. This does not appear to be a coincidence either; for, Ice Rak's current position disadvantages RFC in any dispute concerning the Lease Rider's validity (i.e., the partial subject of this lawsuit).

Finally, the Court notes that the unfair gamesmanship attempted through Ice Rak's inconsistent behavior is precisely what the doctrine of equitable estoppel is designed to prevent. Multiple courts have said as much. *See Marcus v. Fla. Bagels, LLC*, 112 So. 3d 631 (Fla. 4th DCA 2013) ("[T]he lynchpin for equitable estoppel is equity and the point of applying it to compel arbitration is to prevent a situation that would 'fly in the face of fairness.'" (quoting *Grigson v. Creative Artists Agency L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000))); *Com. ex rel. Gonzalez v. Andreas*, 369 A.2d 416, 418 (Pa. Super. 1976) (explaining that "equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed to preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely

17

upon that conduct to his or her detriment"); *Edison Learning, Inc. v. Sch. Dist. of Philadelphia*, 56 F. Supp. 3d 674 (E.D. Pa. 2014) (finding that equitable estoppel is a doctrine of fundamental fairness under Pennsylvania law). Accordingly, given the foregoing analysis, the Court finds that Ice Rak is estopped from disclaiming the Agreement's arbitration provision.  It would be fundamentally unjust to allow Ice Rak to do so where it consistently treated itself as a franchisee under the Agreement right up until the moment that said designation became disadvantageous for it.

Ice Rak's alleged oral franchise agreement does not change the Court's analysis. As an initial matter, Ice Rak's contention that it is an RFC franchisee under oral contract plainly contradicts Ice Rak's Complaint. Indeed, Ice Rak specifically claims that, "Plaintiff [Ice Rak] is neither a Franchisee, nor beholden to the duties and responsibilities of a Franchise Agreement" and "requests a declaratory judgment from the Court . . . determining that [Ice Rak] has no obligations to [RFC] pursuant to *any oral or written franchise agreements*[.]" Dkt. 1 at 5–6 (emphasis added). No amount of wordsmithing can reconcile this with Mr. Kaminsky's testimony— especially where the Complaint also alleges that "[Ice Rak] never executed a Franchise Agreement[.]" *Id.* at 3.

More importantly, the notion that Ice Rak and RFC entered into an oral franchise agreement is undermined by the parties' conduct. To begin with, the Court is unable to find a single reference to any oral contract between Ice Rak and RFC in

the State Lawsuit. This omission makes little sense when one considers the standing challenge brought by the defendants in that case. There, Mr. Kaminsky's response was not to invoke the supposed oral agreement he testified to in front of this Court, but to suggest that Ice Rak's franchisee rights were transferred or assigned from the Agreement through the Lease or the Lease Rider. *See* Dkt. 8-6 at 148–51. What is more, Mr. Kaminsky requested transfer documents from Mr. Wells in relation to the Agreement as late as March 8, 2023. Dkt. 8-3 at 9. It is abundantly clear from these email correspondences that neither Mr. Wells nor Mr. Kaminsky were operating under the belief that an oral franchise agreement already existed between Ice Rak and RFC. *See generally id.* at 2–9. If Mr. Kaminsky was aware of such a contract, furthermore, it is unclear why he was concerned about whether Ice Rak made misrepresentations by representing itself as an RFC franchisee or why he would state that "all believed, and acted as if there would be an entity franchisee with personal guarantees by the owners of the same" as late as March 9, 2023. *Id.* at 5–6. According to Mr. Kaminsky's present testimony, Ice Rak was an entity franchisee pursuant to oral contract as early as May 6, 2021. Dkt. 34 at 133.[3]

---

[3] The Court also notes that, based on Mr. Kaminsky's testimony, Ice Rak's supposed oral contract would be invalid and unenforceable. It is well established that an "oral contract is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms" and that, "in order to be binding, a contract must also be definite and certain as to the parties' obligations to one another." *Seventh Chakra Films, LLC v. Alesse*, 666 F. Supp. 3d 1250, 1267 (S.D. Fla. 2023) (internal quotations and citations omitted). The essential terms of the oral agreement alleged here were anything but certain and definite:

Simply put, Ice Rak held itself out as a franchisee under the Agreement for years. Ice Rak directly benefited from the Agreement for years. Ice Rak is now equitably estopped from claiming otherwise in order to avoid arbitration.

## II.   Whether an Arbitrable Issue Exists

The next issue to consider is whether an arbitrable issue exists. Ice Rak avers that the Complaint presents no arbitrable issues for two reasons: (1) Section 26.6 of the Agreement operates as a two-year statute of limitations that bars RFC's claim to arbitration; and (2) Ice Rak's claims do not arise out of, or relate to, the Agreement.

As a preliminary matter, the Court finds that these are issues for the arbitrator to decide. The Supreme Court has made clear that "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v.*

---

Q: All right. And Mr. Wells, in connection with granting this oral agreement, what representation did he make to you in terms of what the obligations of the franchisee would be under that oral agreement?

A: He did not make any representations or obligations. We are both lawyers. We know what laws apply to franchise relationships.

Dkt. 34 at 133. Moreover, "[t]he stature of frauds precludes actions brought on any agreement or promise that cannot be performed within one year unless the agreement or promise is in writing and signed by the party to be charged therewith." *Stamer v. Free Fly, Inc.*, 277 So. 3d 179, 181 (Fla. 5th DCA 2019). The oral contract alleged by Ice Rak was supposedly entered into prior to May 6, 2021. Dkt. 34 at 107, 133. As such, it contemplates performance spanning well over one year and violates the statute of frauds. *See Dwight v. Tobin*, 947 F.2d 455, 460 (11th Cir. 1991).

*Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (internal quotations and citations omitted). This is exactly what parties have done here. Indeed, Section 26.3.4 of the Agreement provides that "[a]ny dispute arising out of or in connection with this arbitration provision (including any question regarding its existence, validity, scope or termination) shall be referred to and finally resolved by arbitration." Dkt. 8-1 at 66. And, "'when the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.'" *WasteCare Corp. v. Harmony Enterprises, Inc.*, 822 F. App'x 892, 895 (11th Cir. 2020) (quoting *Henry Schein*, 139 S. Ct. at 529).

The Court also disagrees with both of Ice Rak's arbitrability arguments. Consider Section 26.6 of the Agreement:

> Except for claims arising from (i) Franchisee's non-payment of amounts owed to Company and/or its affiliates, (ii) post-termination obligations under this Agreement, or (iii) any violations of intellectual property rights, any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Company, Franchisee's or Company's actions in connection with this Agreement or Franchisee's operation of a Shop will be barred unless a judicial or arbitration proceeding is commenced by either party hereto against the other (including actions Franchisee may bring against Company, its affiliates, officers, directors, and employees) within 24 months from the occurrence of the facts giving rise to such claim or action.

Dkt. 8-1 at 68. Nothing in this provision suggests that RFC having knowledge of Ice Rak's operations as early as October 2021 is of any consequence. This is because Ice Rak's general involvement in the Shop's operation does not form the basis of this declaratory judgment action. Rather, this action is based on the termination of the Agreement and Ice Rak's subsequent attempt to invalidate the Lease Rider, which arose from the Agreement itself. The occurrence of these facts was no later than October 2023. Additionally, Section 26.6's time limitation naturally applies against the party who seeks to state a claim or bring an action against the other. Ice Rak brought the instant declaratory judgment action, not RFC. Section 26.6 is consequently inapplicable here.

This brings the Court to the import of this action's partial focus on the Lease Rider, a contract which does not contain an arbitration provision. It is important to remember that Exhibit E to the Agreement is a standard but uncompleted lease rider form, Dkt. 8-1 at 79, which was contemplated and required by the Agreement, *id.* at 16. The Lease Rider consequently arose out of the Agreement—albeit in a slightly altered form—and is inextricably tied to it. This is further evinced by the fact that, in signing the Lease Rider as a franchisee, Ice Rak agreed to assign RFC all of its rights in the Lease upon termination of the Agreement. Dkt. 1-2 at 34. Further, Ice Rak specifically requests a declaration concerning its "contractual obligations, if any, under any oral or written agreement with [RFC]." Dkt. 1 at 5. The instant

dispute therefore goes both directly to the Agreement and indirectly to the Agreement through the Lease Rider which Ice Rak signed. It is for the arbitrator to decide whether the part of this dispute which indirectly arises out of the Agreement falls under the Agreement's arbitration clause. *See Henry Schein*, 139 S. Ct. at 529.

## III. Waiver

The final issue to consider is whether RFC has waived its arbitration rights. Ice Rak essentially contends that RFC has done so by failing to strictly comply with, or enforce strict compliance with, various provisions in the Agreement throughout its relationship with Ice Rak. Dkt. 37 at 8–12. The Court disagrees.

While there "is no set rule as to what constitutes waiver of an arbitration agreement," *Warrington v. Rocky Patel Premium Cigars, Inc.*, No. 22-12575, 2023 WL 1818920, at *2 (11th Cir. Feb. 8, 2023), "[a] key factor in deciding this is whether a party has substantially invoked the litigation machinery prior to demanding arbitration," *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018) (cleaned up). In this case, RFC's first filing was the instant Motion to Stay Proceedings Pending Arbitration. *See* Dkt. 8. There was no prior invocation of the litigation machinery. Furthermore, the Court is aware of no authority which suggests that a party can waive its arbitration rights by failing to strictly follow wholly unrelated portions of a contract years before the opposing party brings suit.

If this were the case, every breach of contract case involving a contract with an arbitration provision would result in waiver. This is not the law.

## CONCLUSION

Ice Rak is bound to arbitrate this dispute under the Agreement. This action is stayed pending said arbitration. *See* 9 U.S.C. § 3 (generally providing that the courts of the United States shall stay proceedings until the conclusion of arbitration where such arbitration is ordered).

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) RFC's Motion to Stay Proceedings Pending Arbitration (Dkt. 8) is **GRANTED**.

(2) The instant case is stayed pending resolution of the arbitration process. The parties will arbitrate per the Agreement.

(3) The Clerk is directed to administratively close this case during the pendency of the stay; and thereafter any party may reactivate this case by motion.

**DONE AND ORDERED** at Tampa, Florida, on March 14, 2024.

/s/ William F. Jung_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record